[Cite as *State v. Fields*, 2022-Ohio-620.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,               :

                                    Nos. 109675 and 109680

    v.                                            :

DAVID FIELDS,                                    :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 3, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-18-627546-A and CR-18-632955-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Nora Bryan, Assistant Prosecuting
Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Francis Cavallo, Assistant Public Defender, *for
appellant.*

LISA B. FORBES, J.:

{¶ 1}     Appellant, David Fields ("Fields"), appeals his convictions and prison
sentence following a trial.  After reviewing the facts of the case and pertinent law, we
affirm.

## I. Facts and Procedural History

{¶ 2} Fields was charged in three separate indictments related to incidents involving the theft of cigarettes from three different delivery trucks between February and July 2017. In one indictment, Fields was charged with theft, a felony of the fifth degree in violation of R.C. 2913.02, for stealing cigarettes from a delivery truck in Westlake on February 23, 2017 ("the Westlake Incident"). A second indictment, for the robbery of a cigarette truck in Lakewood on June 9, 2017, charged Fields with aggravated robbery, a felony of the first degree in violation of R.C. 2911.01(A)(1) with a firearm specification; kidnapping, a felony of the first degree in violation of R.C. 2905.01(A)(2) with a firearm specification; and having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2) ("the Lakewood Incident"). A third indictment charged Fields with aggravated robbery, a felony of the first degree in violation of R.C. 2911.01(A)(1) with a firearm specification; robbery, a felony of the second degree in violation of R.C. 2911.02(A)(2) with a firearm specification; and having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13, for the robbery of a cigarette truck in Cleveland on July 13, 2017 ("the Cleveland Incident").[1]

{¶ 3} The court ultimately dismissed the charges related to the Lakewood Incident only.

---

[1] The Westlake Incident, the Lakewood Incident, and the Cleveland Incident are collectively referred to as the "Incidents."

**{¶ 4}** The trial court found Fields guilty of having weapons while under disability. The jury returned a guilty verdict on all remaining counts.

**{¶ 5}** For the Westlake Incident, Fields was sentenced to six months in prison. For the Cleveland Incident, Fields was sentenced to three years in prison for the firearm specification, three years in prison for aggravated robbery, and two years in prison for having weapons while under disability. The trial court ordered the firearm specification and aggravated robbery sentences to run consecutively and the remaining sentences to run concurrently. In total, Fields was sentenced to six years in prison on the charges pertinent to this appeal.

**{¶ 6}** Fields timely appealed his convictions related to the Cleveland and Westlake Incidents and the trial court's imposition of consecutive prison sentences.

## II. Trial

### A. Fields's Removal from the Courtroom

**{¶ 7}** Prior to jury selection, Fields requested to represent himself with a new attorney as standby counsel. The trial court explained to Fields that he would be fully responsible for his own defense and that his current attorney would serve as standby counsel. Fields began arguing with the court about his lawyer, prompting the court to warn Fields, "[i]f when that jury's out here and you get argumentative like you are now and you're not listening to what I'm saying, I'm going to put you back in that holding cell. I'm going to put a little speaker in there so you can hear what's going on, but you won't be participating at all." A lengthy back-and-forth between Fields and the trial judge ensued, with Fields demanding a new attorney be

appointed to represent him. The judge eventually told him that he could not have a new attorney and again warned Fields that "if you keep blurting out, you'll be sitting in the holding cell during trial."

{¶ 8} Fields continued complaining that he wanted a new attorney, telling the trial court, "I said I don't want to participate. You can't — you can't make me stay in the court." The judge ordered Fields removed from the courtroom. Fields's counsel did not object. Rather than moving forward with jury selection, the court adjourned for the day stating:

> I'm thinking that we're going to do for the rest of the day is we may just adjourn early. * * * The defendant will have the opportunity to participate and be in the courtroom. If he refuses, then we will have the microphone set up. Each of you will have a microphone, I will have a microphone so that the entire proceedings will be piped into the holding cell in the back.

{¶ 9} When proceedings resumed the next day, Fields again began badgering, to which the trial judge responded, "[s]o these microphones are set up. You will either be in here and be quiet and respectful or you will sit in the holding cell and we will proceed without you." Fields responded by calling the judge "racist" and accusing her of making threats against him. The judge removed Fields for a second time, again without objection from his attorney.

{¶ 10} The jury venire entered the courtroom, and the attorneys proceeded with voir dire. At some point while the attorneys were conducting voir dire, Fields was removed from the holding cell and taken to be seen by a medical professional after he complained of chest pains. After jury selection was concluded, the judge

noted, outside the presence of the jury, that she had just been made aware of Fields's removal from his holding cell for medical evaluation. Again, there was no objection by counsel. The trial court acknowledged that prior to removal from his holding cell, Fields had been "banging and making an extremely loud amount of noise again disrupting the trial."

{¶ 11} Outside the presence of the jury, the state raised the issue of Fields's absence from the courtroom and his subsequent removal for medical reasons, expressing concerns about Fields's inability to hear the closed-circuit proceedings. Fields's attorney made no comment or objection. The trial court agreed to include an instruction about Fields's absence in the final jury instructions.

{¶ 12} On the second day of trial, while the state was questioning a witness, Fields became disruptive and was again removed from the courtroom. The following day, Fields's attorney notified the court that Fields was unable to hear portions of cross-examination. In response, the state noted that while Fields "was in his holding cell there [were] * * * multiple loud [banging] noises presumably from him kicking as he was a couple days prior." The court stated for the record that the "microphones were working * * * they were all working[.]" Fields's attorney made no further comment or objection.

## B. Witness Testimony

{¶ 13} The jury heard testimony from 13 witnesses. Eight of those witnesses relate to the Westlake and Cleveland Incidents, including the two cigarette truck drivers, three members of the Westlake Police Department, two Cleveland police

officers, and a forensic scientist from the state Bureau of Criminal Investigation. The remaining five witnesses testified regarding the Lakewood Incident.

### 1. The Westlake Incident

#### a. Bradley Heilman

{¶ 14} Bradley Heilman ("Heilman") was the cigarette truck delivery driver involved in the Westlake Incident. He testified that on February 23, 2017, he was driving a cigarette delivery truck for Core-Mark. Routes were weekly with drivers being assigned specific routes every day of the week. When Heilman finished making his delivery at 23709 Center Ridge Road in Westlake ("the Westlake Rite Aid"), a car "flew up behind [his] trailer." He described the car as an "olivy [sic] green Ford Taurus" with three men inside. The car pulled up behind the truck's trailer, and two men "jumped out of the passenger side of the car." "One guy opened the trailer door and one guy jumped in." The man outside the truck stood "at the back of the trailer. And the guy inside threw the boxes of cigarettes to him and then * * * he jumped out and they both jumped in the car." While the men were unloading the cigarettes, Heilman tried to take pictures of the car with his cellphone but as soon as he got his phone out, "the car took off in reverse around the corner of the building" before exiting the parking lot. When the car took off, Heilman ran after it and continued taking pictures. Heilman returned to his truck and called the police.

{¶ 15} Heilman described the two men who got out of the car as black males wearing dark-colored hoodies with the hoods up on their head. Their faces were covered. He described the driver as a heavy-set black male.

{¶ 16} According to Heilman, the men stole between 25 and 28 cartons of cigarettes, which had a value of approximately $1,000.

{¶ 17} On March 2, 2017, while on the same delivery route, Heilman noticed a gray Ford Taurus that he believed had three men inside across the street from one of his delivery locations. Heilman was suspicious of the car because it was the same make and model as the car from a week prior with the "30-day tag sitting on it just like the other one * * *." When Heilman pulled away from the delivery location, the Ford Taurus began following him. Once he noticed the car following him, Heilman called the police to report the suspicious activity. "I told them they were following me again, same car or similar car, same body style." The police instructed Heilman to pull into the store where he was making his next delivery and stay inside the truck. Heilman followed those instructions. The gray Ford Taurus "pulled in across the street to a car dealership and parked so [the men] could see [him]." When asked why he believed the car "parked so [the men] could see [him]," he responded, "[t]here's a million parking spots in there but they picked one up by the road where the car was facing the back of my trailer." Soon after Heilman pulled in, two Westlake Police cruisers arrived. One came to where Heilman parked; the other went across the street and approached the gray Ford Taurus. According to Heilman, the men were removed from the vehicle and, afterwards, a female officer told him, "none of the stories matched and they were taking [the men] into custody." The police did not ask Heilman to identify whether these men were the same men who had stolen the cigarettes from his truck on February 23, 2017.

**{¶ 18}** Heilman testified that at the time of the February 23, 2017 theft, he only saw the driver of the green Ford Taurus through the windshield. The driver never exited the car. However, Heilman stated he was "close enough to the car that [he] could see it was a bigger guy." He based that assertion on seeing the driver's arms, chest, and head. While he did not conclusively identify Fields as the driver, when asked if Fields was the driver, Heilman responded "[h]e does look similar to that gentleman."

### b. Mark Arcuri

**{¶ 19}** Mark Arcuri ("Arcuri") is a Westlake Police Department patrolman who, on February 23, 2017, responded to a call for assistance at the Westlake Rite Aid at approximately 9:30 a.m. Dispatch reported that a theft had just occurred at that location. The suspect vehicle was a green Ford Taurus with a temporary license plate.

**{¶ 20}** Upon arriving at the scene, Arcuri interviewed Heilman. From that interview, Arcuri learned that three black men had stolen cigarettes from Heilman's truck before speeding away in a green Ford Taurus. Specifically, Arcuri learned that "[t]wo [men] had gotten out of the vehicle and were taking cigarettes from the back of [Heilman's] vehicle and a third one stays in the vehicle, the driver, and he was wearing a hoodie."

### c. Nicolas Ribich and Patricia Weisbarth

**{¶ 21}** Nicholas Ribich ("Ribich") is a Westlake police patrolman and Patricia Weisbarth ("Weisbarth") is a Westlake detective. On March 2, 2017, Ribich

and Weisbarth each separately responded to a call for assistance at the Westlake Rite Aid at approximately 9:33 a.m. At the time, Weisbarth was already investigating the February 23, 2017 theft of over $1,000 in cigarettes from a delivery truck. Weisbarth identified Heilman as the delivery truck driver on both February 23, 2017, and March 2, 2017.

{¶ 22} Ribich described the vehicle parked across the street from the Westlake Rite Aid in the AutoNation parking lot as a silver Ford Taurus. Patrol officers were the first to arrive at the scene. They approached a silver Ford Taurus and discovered two men inside. The driver identified himself as "Purefoy." The passenger identified himself as "Marvin Tompkins." After investigation by detectives, Ribich and Weisbarth learned that "Tompkins" was a false name. The man's actual name was David Fields, whom Ribich identified in court as the defendant. Additionally, Ribich reported that the stories Purefoy and Fields gave to the officers were inconsistent.

{¶ 23} When Weisbarth arrived at the AutoNation parking lot across from the Westlake Rite Aid, two men had already been removed from the suspect silver Ford Taurus to be interviewed separately. Weisbarth spoke to Fields at the scene. Fields told her that his friend, Purefoy, had picked him up "to go for a ride to meet somebody." After speaking with the officers who spoke with Purefoy, Weisbarth also determined that the two men's stories did not match.

{¶ 24} Weisbarth testified that the silver Ford Taurus Purefoy and Fields were in was registered to Crystal Williams ("Williams"). Weisbarth's investigation

revealed that Williams also had a green Ford Taurus registered in her name. Fields told Weisbarth that he and Williams were in a relationship together. Weisbarth called Williams on the phone. After Weisbarth was finished speaking with Williams, Fields spoke to Williams. According to Weisbarth, Fields said "something to the effect of you know I don't take your car or I'm not the person who was driving" and it appeared to Weisbarth that Fields "was trying to coach [Williams] into what to say to [the police]."

{¶ 25} Fields gave Weisbarth his cell phone number when she interviewed him on March 2, 2017. Weisbarth then "obtain[ed] a court order for the location data of Mr. Fields's cell phone." According to that data, on February 23, 2017, at 9:24 a.m., approximately nine minutes before Heilman's call to the police, Fields's phone was located in Westlake pinging off of a cell "tower at 2110 Columbia Road." That tower is "approximately 1.4 miles away from the scene of the theft * * *" in the Westlake Incident.

{¶ 26} On March 2, 2017, the silver Ford Taurus was towed from the parking lot. No guns or cigarettes were found inside.

### 2. The Cleveland Incident

#### a. Lawrence Fields

{¶ 27} On July 13, 2017, Lawrence Fields ("Lawrence") was a truck driver making cigarette deliveries in the Cleveland area. His last delivery of the day was at 11:30 a.m. for Ecke's Towing Company "located at 1690 Columbus Road in Cleveland" in the Flats. Lawrence recalled that he had gotten the delivery prepared

by the door of his truck when "a car came flying around from the back of the parking lot, stopped at the tail of the truck, and two guys got out."

{¶ 28} Both of the men came from the rear passenger side of the car. According to Lawrence, when the first man exited the car, he had a mask on but then removed the mask, "[a]nd then he started towards [Lawrence] and he had his hands in his pocket and he took his right hand out, showed [him] he had a weapon, a gun * * *." At that time, Lawrence backed away from the man so as not to interfere. The man put the gun back into his pocket.

{¶ 29} The two men loaded cigarettes into their car. According to Lawrence, they took two or three cases of cigarettes, which had 30 cartons per case. After taking the cigarettes, the two men got back into the car and drove away. Once the men drove away, Lawrence called 911 to report the robbery.

{¶ 30} Lawrence described the gunman as a black man wearing dark clothing and a hat. The second man was also black wearing a "white ball cap" and dark clothing. Lawrence stated that he could not definitively make out either of the men's faces because of the hats they were wearing. Lawrence stated that there was a third man in the car, the driver, who never got out. According to Lawrence, all of the men were clean shaven; however, he stated that it had been two years since the incident and he could not remember conclusively. Asked if Fields was the man in the white ball cap, Lawrence stated he believed it was him.

{¶ 31} Lawrence described the car as a gray or silver Chevrolet Impala with no license plates.

### b. Mark Stahovec

{¶ 32} Mark Stahovec ("Stahovec") is a Cleveland police officer who, on July 13, 2017, responded to a call to investigate a vehicle "parked in a gas station off of Fulton Road" that was believed to have been involved in an aggravated robbery earlier that day. The gas station was the Fulton Gas N Go. His body camera footage showed that he arrived on scene at 1:00 p.m.

{¶ 33} When he arrived at the Fulton Gas N Go about an hour after the robbery, Stahovec saw a silver Chevrolet Impala, the suspect vehicle, with no front license plate in the parking lot. He proceeded into the gas station convenience store to ask the clerk about reviewing the security camera footage to see who had gotten out of the vehicle.

{¶ 34} The gas station surveillance video showed the silver Chevrolet Impala pull into the gas station and three black men get out. Two of the men went into the gas station store; the third man, dressed in dark clothing, walked away. Describing the two men who went into the gas station, Stahovec stated that both had gotten out of the passenger side of the car. One had long dreadlocks and was wearing a white t-shirt. The other man had on a black t-shirt.

{¶ 35} Body camera footage from Stahovec and a fellow officer was shown at trial. According to Stahovec, that footage showed Stahovec looking at the silver Chevrolet Impala when he arrived at the gas station. As Stahovec walked into the gas station, two men are seen exiting the gas station.

{¶ 36} Stahovec stated that the two men seen entering the gas station in the surveillance video are the same two men he saw, and who can be seen on his body camera footage, exiting the gas station when he entered. The surveillance footage then showed the two men abandoning the silver Chevrolet Impala after exiting the gas station convenience store.

### c. Aaron Reese

{¶ 37} Aaron Reese ("Reese") is a Cleveland police officer who, in July 2017, was working as a detective for the Cleveland Police Department. He was assigned to investigate the robbery that occurred at Ecke's Towing.

{¶ 38} As part of his investigation, Reese reviewed the field police report, the body camera footage of the responding police officers, and the surveillance footage from Ecke's Towing and the Fulton Gas N Go.

{¶ 39} Reese also spoke with Shadi Murra ("Murra"), an owner of the Fulton Gas N Go, who told him that Fields and Cleveland Gresham ("Gresham") have approached Murra on several occasions trying to sell stolen cigarettes.

{¶ 40} Upon reviewing the body camera footage, Reese identified the two men exiting the store as Fields and Gresham. He believed that these two men fit the description of the men who had committed the July 13, 2017 aggravated robbery. Asked why he believed that, Reese responded, "[s]imilar crimes were occurring in surrounding areas and so I had already seen other surveillance video involving them." Further, Reese stated once Fields and Gresham were arrested, thefts from cigarette trucks in the area stopped.

{¶ 41} The silver Chevrolet Impala was towed from the Fulton Gas N Go and processed as part of the investigation. Cartons of stolen cigarettes were recovered from the vehicle. A beer can, which had condensation on it at the time the car was towed, and a few other items in the car were tested for fingerprints and DNA. Items from the car came back as having DNA from Fields and Gresham. Reese testified that the silver Chevrolet Impala was registered to David Fields.

{¶ 42} Reese's review of the surveillance footage showed two men exiting the Chevrolet Impala on the passenger side. Reese identified those two men as Fields and Gresham. According to Reese, a statement provided by Lawrence described Gresham as the driver during the robbery. Reese explained that sometime in the hour between the robbery and the suspects' arrival at the Fulton Gas N Go, either the men switched seats in the car, or it was possible that the occupants of the car could have changed. However, Reese testified that he believed the three occupants of the car who exited it at the Fulton Gas N Go were the same three men who robbed Lawrence at Ecke's Towing. Asked why that was his belief, Reese responded "the cigarettes in the trunk of that car, there's evidence in the car in terms of DNA and fingerprints that are linked to those guys * * *." Additionally, Reese found it unusual that Fields and Gresham abandoned the vehicle after walking past police when they left the Fulton Gas N Go, stating "[t]hey don't want to have anything to do with that car which I think is unusual because if it's your car you're going to get in your car and leave."

### d. Heather Bizub

{¶ 43} Heather Bizub ("Bizub") is a forensic scientist at the Bureau of Criminal Investigation. Bizub testified as an expert in forensic DNA analysis.

{¶ 44} Bizub explained that the Cleveland police department sent over the following items to be tested for DNA:

> [I]tem 1 was an envelope containing swabs of cigarette cartons found in the trunk.
>
> Item 2 was an evidence envelope containing swabs from a bottle recovered from vehicle.
>
> Item 3 was an evidence envelope containing swabs from a can recovered from the vehicle.
>
> Item 4 was an evidence envelope containing swabs from a bottle from the vehicle.
>
> Item 5 was an evidence envelope containing swabs from the door handle, steering wheel and gear shift of the vehicle.
>
> * * *
>
> [I]tem 6 was the DNA standard from David Fields and item 7 was the DNA standard from Cleveland Gresham.

{¶ 45} According to Bizub, items 1 and 3 were not suitable for DNA comparison because they had a "[v]ery low amount of DNA on" them. The DNA on items 2 and 4 was consistent with Gresham. The DNA on item 5 was "consistent with David Fields. The profile frequency is rarer than one in one trillion."

## III. Law and Analysis

{¶ 46} On appeal, Fields raises seven assignments of error for our review.

## A. Improper Joinder

{¶ 47} In Fields's first assignment of error, he argues that the trial court erred in joining the three indictments for trial. Further, Fields claims that if joinder was proper, the trial court erred by failing to sever the indictments because he was unfairly prejudiced by the joinder. We disagree.

{¶ 48} "This court reviews a trial court's decision on joinder for an abuse of discretion." *State v. Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 103302, 2015-Ohio-4074, ¶ 24, citing *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406. "The law favors joining multiple criminal offenses in a single trial." *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). "This is because joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 18, quoting *Bruton v. United States*, 391 U.S. 123, 134, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

{¶ 49} Under Crim.R. 13, "[t]he court may order two or more indictments or informations or both to be tried together, if the offenses * * * could have been joined in a single indictment or information." A determination of whether separate offenses can be charged in the same indictment is made pursuant to Crim.R. 8(A), which states:

> Two or more offenses may be charged in the same indictment * * * if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected

together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

{¶ 50} "As the language of Crim.R. 8(A) suggests, 'the word "offenses" is applied broadly to include not only those acts stemming from a single criminal transaction, but to *criminal transactions that may not be tied by time and place*.'" (Emphasis added.) S*tate v. Wilson*, 2016-Ohio-2718, 51 N.E.3d 676, ¶ 25 (8th Dist.), quoting *State v. Jackson,* 8th Dist. Cuyahoga No. 102394, 2015-Ohio-4274, ¶ 11.

{¶ 51} Each charge against Fields involved the theft of cigarettes from a truck during a delivery in the Northeast Ohio area. Accordingly, the offenses from all three Incidents could have been charged in a single indictment because the offenses are of a similar character, part of a common scheme or plan, and part of a course of criminal conduct.

{¶ 52} Therefore, we find that the indictments for the three separate Incidents — Westlake, Lakewood, and Cleveland — were properly joined for trial.

{¶ 53} Even where joinder may have been proper under Crim.R. 8(A) and 13, "a trial court should order separate trials pursuant to Crim.R. 14 if it appears the defendant is prejudiced by the joinder." *Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, at ¶ 20. Pursuant to Crim.R. 14, if it appears that a defendant will be prejudiced by the joinder "the court shall order an election or separate trial of counts * * *." The defendant bears the burden of proving prejudice.

{¶ 54} Because Fields did not seek severance under Crim.R. 14, we review for plain error.[2] *State v. Lott,* 51 Ohio St.3d 160, 164, 555 N.E.2d 293 (1990). "To prevail under this standard, the defendant must establish that an error occurred, it was obvious, and it affected his or her substantial rights." *State v. Spaulding,* 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 64. "[A]n error affects substantial rights only if it 'affected the outcome of the trial.'" *Id.,* quoting *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Courts take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 55} Fields argues that because the charges in the indictment for the Lakewood Incident were ultimately dismissed under Crim.R. 29, he was prejudiced by the jury hearing testimony related to those offenses. However, a trial court does not commit plain error by permitting the counts to be tried together if "[t]he joinder of these counts was not erroneous on its face at the outset of trial." *Spaulding* at ¶ 74. Having decided that joinder of the three indictments for trial was not error, and because Fields has not demonstrated prejudice, we cannot find plain error as a result of the trial court not ordering severance. Fields's first assignment of error is overruled.

---

[2] Fields's counsel initially filed a "motion for reconsideration on joinder" pursuant to Crim.R. 14 but withdrew the motion prior to the court ruling on it.

**B. Right to be Present**

{¶ 56} In his second assignment of error, Fields argues that the trial court violated his Sixth Amendment right to be present when he was removed from trial proceedings as a result of his disruptive behavior. Fields acknowledges that the trial court was "within its discretion" when it placed him in a holding cell with audio of the trial proceedings. However, he argues that the trial court erred when it did not halt the proceedings after he was removed from the holding cell to be seen for a medical evaluation. He also argues that the audio feed was inadequate to allow him to hear the trial proceedings at all times. We disagree.

{¶ 57} "The Confrontation Clause of the Sixth Amendment of the United States Constitution guarantees a defendant's right to be present in the courtroom at every stage of the trial." *State v. Boynton*, 8th Dist. Cuyahoga No. 106301, 2018-Ohio-4429, ¶ 34, citing *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). *See also* Ohio Constitution, Article I, Section 10; Crim.R. 43. "However, the right to be present is not absolute." *State v. White*, 82 Ohio St.3d 16, 26, 693 N.E.2d 772 (1998), citing *State v. Meade*, 80 Ohio St.3d 419, 421, 687 N.E.2d 278 (1997). Crim.R. 43 explicitly states that while criminal defendants have the right to be present, the trial court may decide to remove a disruptive defendant from the courtroom.

> Where a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote contemporaneous video, and judgment and sentence may be pronounced as if the defendant were

present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant.

Crim.R. 43(B).

{¶ 58} At the time Fields was removed from his holding cell for medical attention, the trial court was unaware. When it was brought to the court's attention, Fields's attorney made no objection. Because no objection was made at trial, Fields has waived all but plain error on appeal. *See State v. Bello*, 8th Dist. Cuyahoga No. 108735, 2020-Ohio-1506, ¶ 25. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

{¶ 59} Even if a defendant should ordinarily have been present at a stage of the trial, "[e]rrors of constitutional dimension are not *ipso facto* prejudicial." (Emphasis sic.) *State v. Williams*, 6 Ohio St.3d 281, 286, 452 N.E.2d 1323 (1983). Prejudicial error exists only where "a fair and just hearing [is] thwarted by [defendant's] absence." *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674 (1934). The exclusion of a defendant should be considered in light of the whole record. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).

{¶ 60} In *State v. France*, 5th Dist. Richland No. 2011-CA-68, 2012-Ohio-1003, the Fifth District Court of Appeals found no error in the trial court's removal of a criminal defendant from the courtroom after the defendant disrupted the proceedings. The trial court removed France and placed him in a holding cell without audio or video of the trial proceedings. The court found that France's continued disruptions constituted a waiver of his Sixth Amendment right to be present. *Id.* at ¶ 35-36. The court reasoned that

> appellant had ample warning of the consequences of his behavior. He was repeatedly warned that the trial would go forward without him unless he promised to behave, and he made a knowing and voluntary choice. If there is no constitutional violation because appellant voluntarily, by his conduct, waived his right to be present, then it follows that there can be no constitutional violation for the court's failure to provide appellant the opportunity to observe the proceedings via closed-circuit TV or other electronic medium.

*Id.* at ¶ 36.

{¶ 61} Fields was removed from the trial proceedings because of his disruptive behavior both in front, and outside the presence, of the jury. Though the trial court warned Fields that he would be removed if he continued his disruptive behavior, Fields continued. After being loud and disruptive by kicking and banging on the wall inside the holding cell, Fields complained of chest pains and was removed from the holding cell to be seen by a medical professional. Fields has not demonstrated how he was prejudiced by his removal from the holding cell, without the court's knowledge, to attend to a medical emergency. Fields had the benefit of his attorney's presence in the proceedings to continue with voir dire of prospective

jurors. The jurors were instructed that Fields's absence from the proceedings was not to be used against him.

{¶ 62} Under these circumstances, where Fields voluntarily waived his right to be present through his disruptive behavior, the trial court was unaware Fields had been taken for medical evaluation during voir dire, and Fields failed to show prejudice, we find that the trial court's failure to halt proceedings when Fields was removed from the holding cell did not violate his right to be present at trial.

{¶ 63} Fields's argument that the audio feed was not adequate is similarly unavailing. The warnings the trial court provided to Fields after he was brought back into the courtroom following his medical evaluation were unambiguous. The court explained,

> Let me [be] very clear. This trial will go forth. If the defendant becomes disruptive in the courtroom, he will be taken out of the courtroom and placed in the holding cell. We are set up with a microphone that the proceedings — he will be able to hear it.
>
> If the defendant becomes disruptive in the holding cell as he did earlier today, he will be removed from the holding cell and taken back down and the trial again will proceed.
>
> Because at that point the defendant will be basically by his action choosing not to avail himself and be present during this trial.

After receiving that admonition, Fields again became disruptive. Fields began speaking loudly with his attorney while the state was questioning Stahovec. The court asked Fields to lower his voice, and Fields had an outburst about Stahovec testifying leading the court to remove Fields. Again, he waived his right to be present through his conduct. As in *France*, 5th Dist. Richland No. 2011-CA-68, 2012-Ohio-

1003, under these circumstances, the court had no obligation to provide Fields the means to listen to the courtroom proceedings. Fields has failed to demonstrate any error, much less plain error, based on the allegedly inadequate audio feed in the holding cell.

{¶ 64} Fields has not established that but for the removal the outcome of trial would have been different. Accordingly, Fields's second assignment of error is overruled.

## C. Sufficiency of the Evidence

{¶ 65} In his third assignment of error, Fields argues that the state presented insufficient evidence at trial to sustain his convictions. The crux of Fields's challenge is that there was no direct evidence linking him to either of the two Incidents. We disagree.

{¶ 66} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 67} "Circumstantial and direct evidence are of equal evidentiary value." *Cleveland v. Turner*, 2019-Ohio-3378, 132 N.E.3d 766, ¶ 35 (8th Dist.), *appeal not accepted*, 157 Ohio St.3d 1512, 2019-Ohio-5193, 136 N.E.3d 510, ¶ 35, citing *State v.*

*Santiago,* 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12.  A "conviction can be sustained based on circumstantial evidence alone."  *Franklin,* 62 Ohio St.3d at 124, 580 N.E.2d 1, citing *State v. Nicely,* 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988).

**{¶ 68}** Here, sufficient direct and circumstantial evidence was presented at trial to sustain convictions for each of the Westlake and Cleveland Incidents.

### 1.  The Westlake Incident

**{¶ 69}** For his role in the Westlake Incident, Fields was charged with theft. R.C. 2913.02(A)(1) outlines the elements of theft:

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent.

**{¶ 70}** The jury heard testimony that on February 23, 2017, approximately 25 cartons of cigarettes were stolen from a delivery truck at the Westlake Rite Aid. Fields's phone records indicated that his phone pinged off of a cellphone tower less than one and one-half miles away from the Westlake Rite Aid nine minutes before the theft occurred.  Further, the driver of the cigarette truck testified that Fields "looked" similar to one of the men involved in the Westlake Incident.  Fields was further tied to the incident a week later when he was detained after following the same cigarette delivery truck in a car similar to the one involved on February 23, 2017.

**{¶ 71}** Therefore, sufficient evidence was presented that Fields was involved in the theft of cigarettes in the Westlake Incident.

## 2. The Cleveland Incident

**{¶ 72}** Fields was found guilty of aggravated robbery with a firearm specification, robbery with a firearm specification, and having weapons while under disability for the Cleveland Incident.

**{¶ 73}** R.C. 2911.01(A)(1) delineates the elements of aggravated robbery as:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it

R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

**{¶ 74}** Robbery is defined in R.C. 2911.02(A)(2) as:

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;

**{¶ 75}** The court instructed the jury that, in order to find Fields guilty of the firearm specification, they had to find beyond a reasonable doubt that Fields "had a firearm on or about his person or under his control, or acted with another who

possessed a firearm while committing the offense[s]" of aggravated robbery and robbery.

{¶ 76} The court also gave the jury a complicity instruction consistent with R.C. 2923.03(F):

> Complicity in the commission of the offense charged means the conduct of one who purposely and knowingly participates with another as a partner or accomplice for the purpose of committing such offense. Such person is regarded as if he were the principal offender and is as guilty as if he personally performed every act constituting the offense.

{¶ 77} Finally, the court found Fields guilty of having weapons while under disability, a violation of R.C. 2923.13(A)(3), which states:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *

{¶ 78} "[I]n order to 'have' a firearm or dangerous ordnance within the meaning of R.C. 2923.13, an individual must either actually or constructively possess it." *State v. Davis*, 8th Dist. Cuyahoga No. 104221, 2016-Ohio-7964, ¶ 13, quoting *State v. Adams,* 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 16. "Constructive possession cannot be inferred by a person's mere presence in the vicinity of contraband." *State v. Jansen*, 8th Dist. Cuyahoga No. 73940, 1999 Ohio App. LEXIS 2060, 8 (May 6, 1999). The person must have been "conscious of the

presence of the object." *State v. Hankerson*, 70 Ohio St.2d 87, 91, 434 N.E.2d 1362 (1982); *State v. Bray*, 8th Dist. Cuyahoga No. 92619, 2009-Ohio-6461, ¶ 21.

{¶ 79} A criminal defendant can constructively possess a firearm and be convicted of having weapons while under disability if he or she aided and abetted a codefendant "who actually possessed and brandished the gun." *State v. Adams*, 8th Dist. Cuyahoga No. 93513, 2010-Ohio-4478, ¶ 19. *See also State v. Lewis*, 8th Dist. Cuyahoga No. 81957, 2003-Ohio-3673 (finding evidence was sufficient to prove having weapons while under disability when only a codefendant pointed the gun at victims during robbery).

{¶ 80} Ohio's complicity statute states "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). Under R.C. 2923.03(F), a defendant guilty of complicity "shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated * * * in terms of the principal offense."

> "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime."

*Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 102302, 2015-Ohio-4074, at ¶ 33, quoting *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶ 81} At trial, Fields stipulated to a prior felony drug possession conviction; therefore, there is no dispute that he was under disability. Evidence presented at trial demonstrated that on July 13, 2017, two men approached a delivery truck driver while making a delivery. One man showed a gun to the driver before he and a second man unloaded cigarettes from the truck into a car. Approximately 88 cartons of cigarettes were stolen. That delivery truck driver identified Fields as the man who loaded cigarettes into the car with the gunman involved in the Cleveland Incident.

{¶ 82} Evidence also tied Fields to the car where the stolen cigarettes were found. Fields was seen exiting the car at the gas station, and his DNA was found in the car. Lastly, evidence was presented that Fields had, in the past, attempted to sell stolen cigarettes to the operator of the gas station where the car containing the stolen cigarettes was found. Therefore, evidence was presented on each element of aggravated robbery, robbery, having weapons while under disability, and a firearm specification.

{¶ 83} We find that evidence admitted at trial, if believed, could convince the average mind of Fields's guilt beyond a reasonable doubt. The state presented sufficient direct and circumstantial evidence to identify Fields as having been involved in both the Westlake and Cleveland Incidents. Accordingly, Fields's third assignment of error is overruled.

**D. Manifest Weight of the Evidence**

{¶ 84} Next, Fields challenges his convictions as being against the manifest weight of the evidence.

{¶ 85} A challenge to the manifest weight of the evidence "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 1. The Westlake Incident

{¶ 86} In arguing that his conviction for the Westlake Incident was against the manifest weight of the evidence, Fields raises the same issues he raised in his sufficiency argument. Fields takes issue with the fact that only circumstantial evidence links him to the Westlake theft arguing "the circumstantial evidence here fails to make a genuine connection between Mr. Fields and the crime." Fields argues

that, although evidence demonstrated that his phone was in Westlake around the time of the theft, that does not prove that he was in Westlake.

{¶ 87} We find that the jury did not clearly lose its way in finding Fields guilty based on the evidence presented at trial. The jury heard testimony that Fields's phone pinged off of a cell phone tower near the Westlake Rite Aid around the time the theft occurred; Fields was in a similar car following the same delivery truck during the same delivery route a week after the Westlake Incident; when Fields was questioned about following the delivery truck, he gave a false name; both the green and gray Ford Tauruses had temporary license plates; and Fields was in a relationship with a woman who owned both a green and gray Ford Taurus.

## 2. The Cleveland Incident

{¶ 88} Fields's argument that his Cleveland Incident convictions are against the manifest weight of the evidence focuses on the positions of the three men in the Chevrolet Impala involved in the robbery. Fields argues that Lawrence testified that the driver of the silver Chevrolet Impala had dreadlocks, but Reese testified that the man with dreadlocks was not the man who exited the driver's seat of the car at the Fulton Gas N Go. Therefore, according to Fields, the testimony was contradictory and, as such, the jury lost its way in convicting him.

{¶ 89} At trial, Reese was asked about the possibility of the occupants of the car changing and he answered "[t]hat's possible." However, Reese clarified that while it was possible for the occupants to have changed, he did not believe that they had.

{¶ 90} The manifest weight of the testimony at trial supports Fields's convictions. That testimony includes the following: the men in the silver Chevrolet Impala that was left at the gas station generally matched the description of the men involved in the robbery; the vehicle also matched the description of the one involved in the robbery; the stolen cigarettes were in the trunk of the vehicle when inspected by police; Fields's DNA was found inside the vehicle; and surveillance camera footage from the Fulton Gas N Go along with the police officers' body camera footage showed Fields exiting the Impala and going into the store at the Fulton Gas N Go, Fields leaving the store, and Fields walking away from the Fulton Gas N Go abandoning the Impala after police arrived.

{¶ 91} After reviewing the testimony presented at trial, we do not find that the jury clearly lost its way in finding Fields guilty on all counts. Fields's fourth assignment of error is overruled.

### E. Ineffective Assistance of Counsel

{¶ 92} Next, Fields argues that he was denied the effective assistance of counsel when trial counsel failed to move for severance of the three indictments, when trial counsel failed to object to pieces of the state's evidence, and when trial counsel "did nothing" regarding Fields's alleged declining competency throughout trial.

{¶ 93} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*,

466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. To show that he was prejudiced, the defendant must prove that, but for counsel's errors, the result of a trial would have been different. *State v. Williams*, 8th Dist. Cuyahoga No. 66864, 1995 Ohio App. LEXIS 2847, 16 (July 5, 1995), citing *State v. Mills*, 62 Ohio St.3d 357, 376, 582 N.E.2d 972 (1992). The object of an ineffectiveness claim is not to grade counsel's performance. *Id.* at 697. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 3743 (1989).

### 1. Failure to Sever

{¶ 94} Having already overruled Fields's first assignment of error relating to joinder and severance of the indictments and finding that he has not demonstrated prejudice, we find no error in trial counsel choosing not to move for severance after withdrawing Fields's "motion for reconsideration of joinder." Fields's trial counsel withdrew the motion "[i]n light of the recent events * * *." Counsel's decision whether to file a motion for severance is a matter of trial strategy. *State v. Benitez*, 8th Dist. Cuyahoga No. 98930, 2013-Ohio-2334, ¶ 31. "Trial tactics and strategies do not constitute a denial of effective assistance of counsel." *State v. Hawkins*, 2019-Ohio-5133, 150 N.E.3d 519, ¶ 27 (8th Dist.), *appeal not accepted*, 158 Ohio St.3d 1465, 2020-Ohio-1393, 142 N.E.3d 703, ¶ 27. *See also State v. Lee*, 2018-Ohio-1523, 111 N.E.3d 503, ¶ 14-15 (8th Dist.) (finding trial counsel was not ineffective

when the record reflected that counsel considered filing a motion for severance but ultimately chose not to as a matter of trial strategy).

### 2. Failure to Cross-Examine

{¶ 95} Fields argues that his trial counsel was ineffective when he failed to clarify Reese's statement that the Chevrolet Impala involved in the Cleveland Incident was registered to David Fields. Fields argues that the testimony was misleading and prejudicial because the car is actually titled to David Fields, Jr., Fields's son. The state did not ask any questions of Reese to make this clarification, and similarly, Fields's trial counsel did not ask any clarifying questions on cross-examination.

{¶ 96} We note that "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. Whether trial counsel chose to clarify that the Chevrolet Impala at issue in the Cleveland Incident was owned by Fields's son is more akin to trial strategy. Further, evidence at trial established a connection between Fields and the vehicles involved in the Westlake Incident through his connection and relationship with the owner of the vehicles, Williams. Whether Fields or his son owned the silver Chevrolet Impala involved in the Cleveland Incident, Fields does not and cannot demonstrate prejudice. We found that the evidence was sufficient to find Fields guilty of the offenses relating to the Cleveland Incident, and we did so without noting to whom the car was titled. Fields failed to demonstrate that if the clarification

occurred, the outcome of the trial would have been different. Accordingly, we do not find this issue to rise to the level of ineffective assistance of counsel.

### 3. Failure to Assess Competency

{¶ 97} Finally, Fields argues that his trial counsel was ineffective for not seeking to have a competency determination made during trial. Fields argues that his trial counsel should have raised the issue of competency at some point during trial as a result of "his repeated outbursts and his well-known pre-existing mental issues."

{¶ 98} The United States Supreme Court established the standard for assessing a defendant's competency as whether the defendant "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This standard has been codified in Ohio in R.C. 2945.37(G), which states:

> A defendant is presumed to be competent to stand trial. If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial and shall enter an order authorized by section 2945.38 of the Revised Code.

This court has previously held that "[i]t is reasonable to infer that counsel's decision not to pursue the issue of appellant's competence was part of counsel's strategy." *State v. Rubenstein*, 40 Ohio App.3d 57, 64, 531 N.E.2d 732 (8th Dist.1987). This

court noted that a defendant's trial counsel, familiar with the defendant's mental condition, is in the best position to determine whether defendant was capable of assisting with his defense. *Id.*

{¶ 99} The record demonstrates that Fields understood the nature of the charges against him and was able to assist in his defense. On several occasions, Fields made comments on the record about discovery documents that he asked his counsel to request, his desire for his trial counsel to file certain motions, his recollection of the trial court docket pertaining to motions that had been filed, and his belief that certain witnesses should not be permitted to testify. These statements were made at various stages throughout his trial. Therefore, we do not find that Fields's trial attorney was deficient for not raising the issue of competency during trial, because the record does not indicate that Fields did not understand the nature of the charges against him or was unable to aid in his defense.

{¶ 100} For the foregoing reasons, Fields's fifth assignment of error is overruled.

### F. Cumulative Errors

{¶ 101} Next, Fields argues that the cumulative effect of the errors throughout the case deprived him of a fair trial.

{¶ 102} "Under the cumulative error doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Castellon*, 8th Dist. Cuyahoga No. 106813,

2019-Ohio-628, ¶ 44. For an appellate court to find cumulative error, we must find that first, multiple errors occurred at trial, and second, there is a reasonable probability that absent those errors the outcome of the trial would have been different. *Id.*

{¶ 103} Having overruled each of Fields's assigned errors, this argument is without merit. *See State v. Heineman*, 2016-Ohio-3058, 65 N.E. 3d 287, ¶ 85 (8th Dist.) ("We found no error in [defendant's] trial, and, as a result, his [cumulative error] assigned error is overruled.") Fields's sixth assignment of error is overruled.

## G. Consecutive Sentences

{¶ 104} Finally, Fields argues that the trial court erred when it ordered his prison sentences to run consecutively. Specifically, Fields argues that the court's findings were not supported by the record, and, therefore, they are contrary to law.

{¶ 105} To impose consecutive prison sentences, the court must make three findings. First, the court must find that consecutive sentences are "necessary to protect the public from future crime or to punish the offender." R.C. 2929.14(C)(4). Next, the court must find "that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* Finally, the court must find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the

multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Id.*

**{¶ 106}** To make the requisite statutory findings, "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326, 715 N.E.2d 131 (1999). The trial court must "incorporate its findings into its sentencing entry." *Bonnell* at ¶ 37. The trial court is not required to make a "talismanic incantation of the words of the statute." *Id.*

**{¶ 107}** R.C. 2953.08(G)(2), which guides our review of consecutive felony sentences, "compels appellate courts to modify or vacate sentences if they find by clear and convincing evidence that the record does not support any relevant findings under * * * (C)(4) of section 2929.14[.]" *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22; *see also State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 28; *State v. Roberts*, 2017-Ohio-9014, 101 N.E.3d 1067, ¶ 10 (8th Dist.) ("[i]f the court made the required findings in order to impose consecutive sentences, we must affirm those sentences unless we 'clearly and convincingly' find that the record does not support the court's findings," quoting R.C. 2953.08(G)(2)).

> The statute is written in the negative; that is, an appellate court does not need to clearly and convincingly find that the record supports the findings in order to affirm, but instead must clearly and convincingly find that the record does not support the findings in order to reverse or modify a sentence.

*Roberts* at ¶ 10.

{¶ 108} In its journal entry, the court stated that it "considered all required factors of law" and found "that consecutive service of the prison term is necessary to protect the public from future crime or to punish defendant[.]" The court further stated "consecutive sentences are not disproportionate to the seriousness of the defendant's conduct and to the danger defendant poses to the public[.]" Finally, the court found

> at least two of the multiple offenses were committed in this case as part of one or more courses of conduct, and the harm caused by said multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of defendant's conduct.

{¶ 109} The trial court made the requisite statutory findings, and Fields is not challenging that aspect of his sentence. Rather, Fields argues that the record does not support the trial court's finding under R.C. 2929.14(C)(4)(b) that at least two of the multiple offenses were committed as part of one course of conduct and the harm caused by the multiple offenses was so great or unusual that no single prison term adequately reflects the seriousness. Specifically, he argues that the Westlake Incident was "a non-violent theft of cigarettes from the back of a truck" and the harm was merely "economic in nature." Further, Fields argues that the Cleveland Incident was "classified as an offense of violence" because the driver of

the cigarette truck was restrained at gunpoint, but that none of the culprits, Fields included, was positively identified as the gunman.

{¶ 110} We do not find these arguments compelling. Evidence presented at trial demonstrated that Fields took part in two thefts from cigarette trucks, and one of those thefts involved a weapon. Regardless of the fact that Fields was not identified as the gunman, he took part in the violent crimes.

{¶ 111} Upon review, we find that the Fields has not demonstrated that the record does not support the trial court's findings and decision to impose consecutive sentences. Fields's seventh and final assignment of error is overruled.

{¶ 112} Having overruled all seven of Fields's assignments of error, we affirm the judgment of the trial court.

{¶ 113} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR